



FILED
Oct 01, 2025
08:18 AM(CT)
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS

# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | |
|---|---|
| William Fults,<br>　　　　Employee,<br>v.<br>Gant Oil Company, Inc.,<br>　　　　Employer,<br>and<br>Federated Mutual Insurance<br>Company,<br>　　　　Carrier. | Docket No. 2025-50-1067<br><br><br><br>State File No. 13991-2024<br><br><br><br>Judge Kenneth M. Switzer |

---

## EXPEDITED HEARING ORDER GRANTING MEDICAL BENEFITS

---

This case presents "the often daunting challenge of quantifying causation in circumstances where an employee is alleging a work-related aggravation of a pre-existing condition." *Edwards v. Peoplease, LLC,* 2024 TN Wrk. Comp. App. Bd. LEXIS 23, at *14, *appeal docketed*, (July 2, 2024).

William Fults seeks Gant Oil Company's authorization of a total knee replacement. His expert, Dr. Robert Landsberg, stated that the need for this surgery primarily relates to a work accident at Gant, while Dr. Jeffrey Peterson, the authorized physician, disagreed. After a September 23, 2025 expedited hearing, the Court holds Mr. Fults is likely to prevail at a hearing on the merits regarding the work-relatedness of his need for surgery and grants his request.

### Claim History

*Injury and treatment*

Mr. Fults's petition alleged that he injured his left knee at work on January 24, 2024. It stated he "was climbing up [a] truck ladder that gave way causing him to fall." His declaration added that he fell "from a ladder several feet . . . striking and twisting his left knee."

1

A few days later, Mr. Fults saw his primary care physician, Dr. Jimmie Woodlee, who ordered imaging of the left knee. The February 5 x-rays showed "mild tricompartmental degeneration" and "moderate joint effusion," while the February 14 MRI revealed "[u]ndersurface tearing of the medial meniscal body and posterior horn," "[s]mall free edge fraying of the lateral meniscal body," and "[t]ricompartmental chondromalacia." Dr. Woodlee then referred Mr. Fults to Dr. Peterson.

In March, Dr. Peterson reviewed Mr. Fults's imaging and examined him. The doctor noted that Mr. Fults reported "a fall off a ladder." He recommended a left-knee arthroplasty to repair the torn meniscus.

The carrier did not immediately authorize the procedure, so Mr. Fults returned to Dr. Peterson in May. He reported worsening pain, so the doctor ordered an updated MRI of the left knee. The MRI confirmed the meniscal tear and showed "grade 4 chondromalacia of the medial compartment" and "moderate tricompartmental osteoarthritic changes of the knee."

Dr. Peterson repeated the surgery recommendation at the next visit in June. Another MRI taken later that month yielded the same results. The reviewing physician commented, "These findings have advanced since prior exam."

Mr. Fults underwent authorized surgery in July, and operative notes recorded that Dr. Peterson was "pleased" by the results. The notes further stated "[m]eniscal shaving and partial medial meniscectomy was performed," and, "[t]he lateral compartment showed some mild inner border tearing of the lateral meniscus, for which a meniscal shaving was performed." Dr. Peterson additionally wrote, "Based on the level of arthritis seen today, he will likely be a TKA candidate in the future."

At follow-up visits in September and October, Dr. Peterson recorded "good healing" but also that Mr. Fults was continuing to have knee pain. As an addendum to the October visit notes, Dr. Peterson wrote:

> I was able to review the patient's preoperative MRI as well as his intraoperative surgical details from his right knee arthroscopy. At the time of his surgery I did make a comment on his face sheet as well as in his operative report that he does have significant chondromalacia of the medial compartment as well as patellofemoral joint[,] which would likely necessitate a total knee arthroplasty in the future. My gut is that he continues to have pain because of the arthritis and not because of the continued meniscal pathology. I did inform him that he will likely need to pursue further treatment for his right knee issues outside of the worker's compensation system because *his arthritis is a pre-existing issue that was obviously aggravated by his fall but that his work injury did not cause the arthritis.*

2

(Emphasis added).

At the next visit in November, Dr. Peterson placed Mr. Fults at maximum medical improvement with no restrictions for the torn meniscus. Dr. Peterson echoed his opinion about the arthritis from the previous visit, writing that Mr. Fults had continued pain and swelling in the left knee," along with "severe arthritis," which would be treated with Mr. Fults's health insurance. He explained:

> I do not feel that the arthritis is a direct causal relation with his injury at work. The meniscus for sure has been problematic for him and that was addressed with the surgery via worker's compensation but a total knee replacement at this point based on his arthritis pattern . . . would be hard for me to document [or] justify causation from his work injury.

At his attorney's request, Mr. Fults saw Dr. Robert Landsberg for an independent medical examination in April 2025. Dr. Landsberg reviewed records and previous imaging, performed his own imaging, and examined Mr. Fults.

He wrote in his report that Mr. Fults had no complaints or problems with his left knee until the work accident. Dr. Landsberg recounted that the surgeon "removed articular cartilage from the medial femoral condyle and remove[d] the portion of the medial meniscus at the time of surgery." He continued:

> [H]ad it not been for the work injury of [1/24/2024], he would not be having the problems with his left knee that he is having now. After the work injury, chondroplasty shaving and torn meniscus with partial meniscectomy, he now has severe bone-on-bone symptomatic osteoarthritis in the left knee. *Therefore, with a reasonable degree of medical certainty, the work injury of [1/24/2024] led to the progression of his osteoarthritis leading to the fact that he needs a total knee replacement now.*

(Emphasis added).

*Lay testimony*

Mr. Fults, age 80, gave a detailed account of how the injury occurred. He explained that the gas delivery truck he drove is equipped with a long hose through which fuel passes to the customer's tank. Mr. Fults had transferred diesel from the truck to the tank and then needed to close the lid on the top of the tank on the truck. He climbed up the ladder attached to the delivery truck and near the top, he placed his left foot on a railing when the ladder gave way, twisting his left knee. He said he was five or six feet above ground. The ladder broke a mirror on the truck before he struck the ground. He managed to drive the truck back to Gant and reported the injury.

Mr. Fults further testified that before the work injury, he had no problems with his knee. He experienced no difficulty walking approximately three miles, three times per week, and five miles once per week for exercise. He had never undergone any type of treatment for his knee. His son, Christian Fults, confirmed in testimony that his father can no longer walk for exercise.

Mr. Fults has returned to work, and despite Dr. Peterson placing him under no restrictions, Gant does not require him to climb ladders anymore. He said that if he were to try to climb a ladder, he would probably fall. Mr. Fults occasionally still climbs stairs at work. He wishes to undergo the knee replacement with Dr. Peterson.

*Dr. Landsberg's deposition*

Dr. Landsberg was deposed in July and is a Board-certified orthopedic surgeon in practice since 1975. He operates two days per week, typically on knees, shoulders, hips, hands, ankles, and wrists.

Dr. Landsberg testified about his meeting with Mr. Fults, saying that Mr. Fults told him he had no problems before the work accident with his left knee.

The doctor described in detail his understanding of how the accident occurred. Mr. Fults was climbing up a ladder attached to his truck, with one foot on the railing and the other on the ladder, when "the ladder started sliding away from the truck" and "started to move." He said Mr. Fults hit the truck's side mirror before landing "forcefully," and from the fall his "left knee bent out in a funny direction." Landsberg Dep. 11:18-12:2.[1] Dr. Landsberg later added that Mr. Fults suffered a "complex injury," saying: "He twisted, he fell, he landed on his knee. His knee twisted after he fell. He thinks it bent out to the side abnormally. And that's all compatible. Those MRI findings and then eventually arthroscopic findings were compatible with that injury." 14:20-25.

Dr. Landsberg discussed the imaging taken shortly after the accident and later. The February 14, 2024 MRI showed the meniscus tear and "small free edge fraying," as well as "mild tricompartmental chondromalacia." 12:15-17. He added that chondromalacia refers to the "soft cartilage," and the x-ray showed mild arthritis. 12:21, 12:24-25. Dr. Landsberg said the June MRI showed "dry compartmental degenerative changes . . . so a little bit worse with chondromalacia." 13:6-8. In addition, it showed "progressive abnormality." 17:9.

He then turned to the meniscal repair, during which Dr. Peterson "took away some of the articular cartilage, the unstable portion of the articular cartilage." 13:22-24. Dr. Landsberg explained that the chondromalacia is "graded" or classified using a number

---

[1] Given the complexity of the medical proof in this case, for ease of appellate review, the Court opted to cite to the doctors' deposition transcripts.

system. Grade one is "softening"; grade two is a "little fissuring"; grade three is "peeling off a little"; grade 4 is "erosion to the bone." 14:6-15. At the time of surgery, Mr. Fults was grade three, so Dr. Peterson "removed some of the joint surface because it was flapping in the breeze a little bit." 14:11-14.

Post-surgery, Mr. Fults still reported pain but also experienced new symptoms, such as his knee buckling or giving way. 16:16. Dr. Landsberg examined him and said that Mr. Fults could not straighten his left knee. 18:18. He observed that Mr. Fults's left knee appeared "bow-legged" compared to the other knee, and he noted thigh atrophy. 18:15-17, 19:1.

Dr. Landsberg took x-rays, which showed "severe advanced osteoarthritis in the left knee," "bone-on-bone rubbing," and "he's got no joint space at all." 19:18-19, 20:1-3. He said that the work injury led to the torn meniscus as well as damage to the joint surface. Specifically, "when he tore that meniscus, . . . that injury it [sic] jammed the joint surface. And from that day on, the torn meniscus and the abnormal articular cartilage just became more and more frayed. And that all started after the work injury." 18:2-7. The only option for Dr. Peterson was to remove the tear and the damaged portions of the surface. 21:8-11. This left Mr. Fults with "less cushioning," and he was "less shock absorbent." 22:4-5.

Dr. Landsberg concluded:

[H]ad it not been for the work injury . . . , he wouldn't have had the pain and damage to the joint surface of the meniscus. He wouldn't have needed the arthroscopic surgery, and he would not have bone-on-bone arthritis in the left knee with the cystic changes and the spurs. . . . So had it not been for the work injury he wouldn't have had the damage to his joint surface and meniscus. He wouldn't have needed the arthroscopic surgery, and that's why his arthritis progressed rapidly after the work injury and surgery.

23: 8-20. Dr. Landsberg conceded that other potential treatments were available, but he said that a total knee replacement was inevitable, and there is "no need to put it off when you are already 80 years old and you need something done." 24:16-18.

On cross-examination, Dr. Landsberg agreed that the February 24, 2024 MRI already showed grade four chondromalacia, but he clarified that the tibial surface did not show grade four but the femoral surface did. 34:14-20, 35:21-23. He testified that he looked at imaging from the left *and* right knees taken in February 2024, which was incorrect since he later admitted that no x-rays of the right knee were taken at that time 20:4-6, 33:4-7.

Dr. Landsberg said that before the work incident, "[H]e obviously had some pri-existing [sic] arthritis. He probably had grade three/four chondromalacia pre-existing[.]" 41:15-17. Counsel further asked if Mr. Fults's activities or work after the accident "caused

or contributed to his need for surgery for the meniscus or the ultimate knee replacement which [sic] you are suggesting." Dr. Landsberg said:

> Once you have damage to the meniscus, say with that injury that he had, as well as the joint surface , walking, climbing and the more you are up the more you do, you start, you continue running, jumping, and doing all that, it's going to progress more rapidly. So, yeah, everyday he walked on it, probably got a little worse.

42:13-24.

## Dr. Peterson's deposition

Dr. Peterson was deposed a month later and similarly began with his qualifications. He has been practicing since 2001 and is a Board-certified orthopedic surgeon. He performs surgery such as meniscal repairs or knee replacements "pretty much every day." Peterson Dep. 6:12.

He testified that the February 14, 2024 MRI clearly showed the torn meniscus as well as "absolute complete loss of articular cartilage on the distal femur," which was preexisting cartilage loss. 10:5-12, 23. When asked on direct examination if he agreed that Mr. Fults more likely than not would have needed a knee replacement at some point "based upon a natural progression of the underlying condition," Dr. Peterson responded, "Most likely, yeah, with full-thickness loss of cartilage." 12:11-16.

He added that during surgery he saw grade three to four arthritis in the inside part of the knee (medial, femur, and tibia). 13:11-13. He wrote immediately after surgery that Mr. Fults would need a knee replacement in the future. 14:14-17.

Then the following exchange occurred about causation:

> Q: [I]n your opinion, to a reasonable degree of medical certainty, was that level of arthritis that you just described caused by the fall or accident that's the subject of this claim or any of the treatment that Dr. Woodlee or you provided?

> A: Absolutely not. . . . I've done this for 20 years. The arthritis that this man had at the time of his index surgery is not correlated at all with a fall from a ladder. It would never necessitate or never cause that kind of arthritis in that short of a time course. Absolutely not. Never seen it.

14:22-25, 15:1-3, 15: 7-12.

Dr. Peterson said that he disagreed "100 percent" with Dr. Landsberg's opinion and identified areas within the report that he disputes. 16:1.

He was critical of Dr. Landsberg's interpretation of the imaging. Dr. Peterson said that Dr. Woodlee took "supine" x-rays, meaning Mr. Fults was lying on the x-ray table and was not "weight-bearing" or standing up. However, Dr. Landsberg took weight-bearing imaging. 17:11-25, 18:1-5. He agreed this was not an "apples to apples" comparison because with the supine view, "There's no weight through the joint." 18:9-12. He also said that "projectional changes" can affect the view of an x-ray. 19:9-12.

The questioning below conveys his opinion using the statute's terminology:

Q: [A]ssuming that the standard for establishing causation is that a physician must state to a reasonable degree of medical certainty that the condition—in this situation, a knee replacement—was caused primarily—which in this circumstance means greater than 50 percent—by the accident or by the resulting care from that accident, when considering all causes. If that's the definition of injury that has to be established, would you be able to say that his need for a knee replacement was caused primarily by either the accident or your treatment or Dr. Woodlee's treatment when considering all causes?

A: Absolutely not.

19:17-25, 20:1-5.

Dr. Peterson explained that the preexisting condition "is the sticking point." 21:19-20. He acknowledged that the work injury "aggravated" the preexisting arthritis—"[B]ut it didn't cause the arthritis and [did] not necessitate the need for a total knee, from my perspective." 22:3-9. Counsel followed up with, "[A]s far as the arthritis, we're not able to speak anatomically as to whether that was advanced as a result of the fall?" Dr. Peterson answered, "Correct." 22:21-24.

On cross-examination, Dr. Peterson said his understanding of the mechanism of injury was "he fell off a ladder." 23:8, 15-16. Dr. Peterson acknowledged that Mr. Fults did not tell him that he fell approximately six feet or that he was required to climb up onto a fuel tanker with hoses. 32:10-22. He further said that Mr. Fults's work accident "absolutely" aggravated his underlying arthritis. 34:2-8. However, counsel did not ask about, nor did Dr. Peterson volunteer, a percentage on whether that aggravation primarily caused the need for a knee replacement.

**Findings of Fact and Conclusions of Law**

Mr. Fults must show a likelihood of prevailing at a hearing on the merits that he is entitled to the recommended knee replacement surgery. Tenn. Code Ann. § 50-6-239(d)(1)

7

(2024); *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015).

Under the Worker's Compensation Law, an injury is "accidental" only if it is caused by a specific incident, or set of incidents, arising primarily out of and in the course and scope of employment, and "shall not include the aggravation of a preexisting disease, condition or ailment *unless it can be shown to a reasonable degree of medical certainty that the aggravation arose primarily out of and in the course and scope of employment*." *Id.* § 50-6-102(12)(A) (Emphasis added). Further, an injury causes the need for medical treatment "only if it has been shown to a reasonable degree of medical certainty that it contributed more than fifty percent (50%) in causing the . . . need for medical treatment, considering all causes." *Id.* § 50-6-102(12)(C).

The Appeals Board recently instructed that, in circumstances where an employee is diagnosed with a relevant preexisting condition, a trial court should consider:

> (1) whether the employee was symptomatic or asymptomatic prior to the work accident; (2) whether the employee was experiencing any functional limitations caused by that preexisting condition prior to the work accident; and (3) whether the evidence reveals any anatomic change to the body part(s) in question after the work accident.

*Allen v. Deliveries via ISG, LLC,* 2025 TN Wrk. Comp. App. Bd. LEXIS 16, at *10 (Apr. 29, 2025) (Internal quotations omitted). A trial court should consider all other relevant factors in assessing whether a work-related accident has materially advanced, aggravated, or accelerated a preexisting condition to the point that the need for medical treatment and/or any resulting disability arises primarily from that work accident. *Id.*

Longstanding case law holds that when the medical testimony differs, the trial judge must choose which view to believe. *Orman v. Williams Sonoma, Inc.,* 803 S.W.2d 672, 676 (Tenn. 1991). The trial court "is allowed, among other things, to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Id.*

In addition, Dr. Peterson was not selected from a panel of physicians, but he became an authorized treating physician from a referral. The rebuttable presumption of correctness attributable to a causation opinion applies only to opinions expressed by a treating physician selected from a panel of physicians. *Gilbert v. United Parcel Serv., Inc.,* 2019 TN Wrk. Comp. App. Bd. LEXIS 20, at *13 (June 7, 2019).

Here, both physicians concluded that Mr. Fults's arthritis preexisted the work accident. The question is whether the work accident aggravated the preexisting arthritis and whether Mr. Fults has shown "to a reasonable degree of medical certainty that the

aggravation arose primarily out of and in the course and scope of employment." The Court finds that he did.

Looking first at the considerations in *Allen,* Mr. Fults credibly testified that he had no symptoms in his left knee before the work accident. At age 78, he was able to perform all job duties, including regularly climbing ladders, with no trouble, and he also walked approximately 14 miles per week for exercise. His son confirmed this testimony.

As to whether the physicians saw "any anatomic change to the body part(s) in question after the work accident," the experts disagreed. When asked if he was unable to "speak anatomically as to whether [the arthritis] was advanced as a result of the fall, Dr. Peterson answered, "Correct." But two other physicians did note anatomical changes.

Specifically, the physician who read the June 2024 MRI noted grade four chondromalacia and commented, "These findings have advanced since prior exam." Dr. Landsberg likewise testified to several anatomical changes that he observed. He compared the left-knee imaging in February 2024 to the June imaging. The former showed "mild tricompartmental chondromalacia" and "mild arthritis," but the latter revealed "dry compartmental degenerative changes . . . so a little bit worse with chondromalacia." Moreover, after the surgery, Dr. Landsberg testified that Mr. Fults by then had "bone-on-bone arthritis in the left knee with the cystic changes and the spurs." He also had thigh atrophy and appeared slightly bow-legged. The Court finds that Mr. Fults underwent numerous anatomical changes after the work accident, including advancement of the preexisting arthritis.

Turning now to the *Orman* factors, the Court first finds that both physicians are well-qualified to give expert opinions, so this factor favors neither. Dr. Peterson was a treating physician who saw Mr. Fults six times and performed surgery, directly observing the condition of the knee, while Dr. Landsberg saw him once for an independent medical examination. This factor favors Dr. Peterson's opinion. Further, both physicians considered the same information: multiple sets of imaging and records from Drs. Woodlee and Peterson. This factor favors neither.

But the last factor—the evaluation of the importance of that information by other experts—is significant in this case and the one that tips the scales in Dr. Landsberg's favor.

Specifically, both doctors' records contain a history, but their testimony of their understanding of the mechanism of injury differs dramatically. In Dr. Peterson's opinion, Mr. Fults "fell from a truck." He was unaware of the twisting mechanism, nor did he know that Mr. Fults fell approximately six feet to the ground and landed forcefully, with his knee bent in an awkward direction. Dr. Landsberg in contrast knew about those details of the incident, and he explained that the "twisting" made the injury "complex" and correlated with the imaging results.

As to the imaging, Dr. Peterson testified to the difference between supine and weight-bearing images and agreed it was not an "apples to apples" comparison. But he did not fully explain why Dr. Landsberg's testimony about what the images showed, and the differences between the two, was wholly unreliable. He also did not point out where "projection" might have occurred to affect the resulting images.

Moreover, the fact that Dr. Landsberg mistakenly said that images were taken of both knees in February 2024 does not negate his opinion entirely. The more important comparison is not between the injured and non-injured knee at any given time, but rather between images of the *left knee only* as time passed, which showed an anatomical change and the rapid progression of the arthritis.

Dr. Landsberg offered a plausible explanation for the need for the knee replacement: that the shaving of the meniscus and joint surface, while necessary to repair the meniscus, had the dual and unfortunate effect of also hastening the progression of Mr. Fults's preexisting arthritis. Dr. Peterson disagreed with this "100 percent," but he did not elaborate on the shaving and the impact it could have had. Instead, he simply testified that the work injury did not cause the arthritis—a given—and need for a knee replacement.

Importantly. Dr. Peterson *never* offered an opinion on whether the work injury "aggravated" Mr. Fults's preexisting arthritis so that the aggravation was or was not the "primary cause" of the need for surgery. Stated another way, Dr. Peterson's opinion is incomplete, because he never expressed a percentage regarding whether the incident aggravated the preexisting condition to necessitate the knee replacement.

Dr. Landsberg did—twice. He wrote in his report, "within a reasonable degree of medical certainty, the work injury of [1/24/2024] led to the progression of his osteoarthritis leading to the fact that he needs a total knee replacement now." He also testified, "[H]ad it not been for the work injury, he wouldn't have had the damage to his joint surface and meniscus. He wouldn't have needed the arthroscopic surgery, and that's why his arthritis progressed rapidly after the work injury and surgery."

Finally, "the Supreme Court has consistently held that an employee's assessment as to his or her own physical condition is competent testimony that is not to be disregarded." *Limberakis v. Pro-Tech Sec., Inc.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 53, at *6 (Sept. 12, 2017). As previously stated, Mr. Fults credibly testified that he had no problems with the knee until the work accident, but since then he has experienced disabling pain and other symptoms.

For all these reasons, the Court finds that the January 24, 2024 work incident aggravated Mr. Fults's preexisting osteoarthritis, and this aggravation, and treatment of it, primarily caused his current need for a total knee replacement. The Court holds he is likely to prevail at a hearing on the merits on this question.

IT IS THEREFORE ORDERED:

1. Gant Oil Company shall pay for all future reasonable, necessary, and work-related treatment for Mr. Fults's left knee, to include a total knee replacement from Dr. Jeffrey Peterson, the authorized treating physician.

2. The Court sets a status hearing on **January 26, 2026, at 10:00 a.m. Central Time**.  You must call 615-532-9552 or 866-943-0025 to participate.

3. Unless an interlocutory appeal is filed, compliance with this order must occur by seven business days of the date below as required by Tennessee Code Annotated section 50-6-239(d)(3).

**ENTERED October 1, 2025.**


*Kenneth M. Switzer*
**JUDGE KENNETH M. SWITZER**
**Court of Workers' Compensation Claims**

11

# Appendix

Exhibits:
1. Declaration of William Fults
2. Stipulations
3. Dr. Landsberg's deposition
4. Dr. Peterson's deposition
5. Medical records
6. Declaration of Jayne Plympton

# CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on October 1, 2025.

| Name | Certified Mail | Regular mail | Email | Sent to |
|---|---|---|---|---|
| D. Russell Thomas, employee's attorney | | | X | russthomas@thethomaslawfirm.com claudia@thethomaslawfirm.com |
| Carrigan Hicks, Brett Burrow, employer's attorneys | | | X | Chicks@burrowlee.com bburrow@burrowlee.com tbtasher@burrowlee.com |

_____

Penny Shrum
Clerk, Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
   ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
   ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.

   When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

   **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
[www.tn.gov/workforce/injuries-at-work/](www.tn.gov/workforce/injuries-at-work/)
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____
**Employee**

v.

_____
**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal
Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

### Parties
**Appellant(s)** (Requesting Party): _____  ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____

*[Signature of appellant or attorney for appellant]*